## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND
### (Southern Division)

| | |
|---|---|
| DEREK CRAIN, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> v.<br><br>MACROGENICS, INC., and SCOTT KOENIG,<br><br>     Defendants | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Derek Crain ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by MacroGenics ("MGNX" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of MGNX's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased MGNX's stock or sold MGNX puts between March 7, 2024 to May 9, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning MGNX's early interim safety data from the MGNX's ongoing TAMARACK Phase 2 study of vobramitamab duocarmazine (vobra duo) in patients with metastatic astration – resistant prostate cancer (mCRPC) that materially mislead and/or failed to disclose information pertinent to investors. Defendants provided an update on the Phase 2 TAMARACK study of vobra duo. The announcement summarized a research abstract's finding as to vobra duo's safety profile, in which grade 3 events were under 32% for both doses and no death reports.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts related to early interim safety data results from the TAMARACK Phase 2 study. On May 9, 2024, the data mentioned pertinently shows that, "Treatment – Emergent Adverse Events All Grade" were 98.9% and 100% for the two doses. In pertinent part, MGNX's announcement was as follows:

> Next, I will review interim safety in the TAMARACK study as of the data cutoff. Slide 14 shows the overall summary of adverse events in this study to date. I'll point out a few parameters by dosing cohort. Of the 90 patients who receive vobra duo at 2 mg per kg, 89 or 98.9% experienced a study treatment-emergent adverse events of any grade. 49 or 54.4% of the patients had a Grade 3 or greater TEAE and 10 patients or 11.1% had adverse events leading to study drug discontinuation. Of the 86 patients who received vobra duo at 2.7 mg per kg, 86 or 100% experienced a TEAE of any Grade. 44 or 51.2% of patients at a Grade 3 or greater TEAE and 13 patients or 15.1% at an AE leading to study drug discontinuation.

4.      In a press release also dated May 9, 2024, MGNX stated further that:

A total of five events with fatal outcome occurred as follows: one Grade 5 event in the 2.0 mg/kg dosing cohort: acute myocardial infarction (considered unrelated to study drug by the investigator); three Grade 5 events in the 2.7 mg/kg dosing cohort: one cardiac arrest (considered unrelated to study drug by the investigator) and two events of pneumonitis. In addition, a patient in the 2.7 mg/kg dosing cohort had a Grade 3 pleural effusion that is recorded as having a fatal outcome. The latter three deaths are being investigated, as follow-up is incomplete on this ongoing trial.

5.      Investors and analysts reacted immediately to MGNX's revelation. The price of MGNX's common stock declined dramatically. On May 9, 2024, MGNX's stock closed at $14.67/share. On May 10, 2024, the stock declined to $3.31/share. In total, MGNX's stock declined 77.4% due to a drop of $11.36/share.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 18 of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant MGNX is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**THE PARTIES**

11.     Plaintiff purchased MGNX's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud.

12.     MGNX is a Delaware corporation with its principle executive offices located at 9704 Medical Center Drive, Rockville, MD 20850. During the Class Period, the Company's common stock traded on the NASDAQ stock Market (the "NASDAQ") under the symbol "MGNX".

13.      Defendant Scott Koenig ("Koenig") was at all relevant times, the Chief Executive Officer and President of MGNX.

14.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MGNX's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

15.     MGNX is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

16.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to MGNX under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

17.     MGNX is a biopharmaceutical company focused on discovering, developing, manufacturing and commercializing innovative monoclonal antibody-based therapeutics for the treatment of cancer.

18.     MGNX generates its pipeline of product candidates primarily from its proprietary suite of next-generation antibody-based technology platforms, which have applicability across broad therapeutic domains. The combination of MGNX's technology platforms and protein engineering expertise has allowed the MGNX to generate promising product candidates and enter into several strategic collaborations with global pharmaceutical and biotechnology companies. To date, two products originating from MGNX's pipeline of proprietary or partnered product candidates have received U.S. Food and Drug Administration (FDA) approval.

### *Defendants' False and Misleading Statements*

### *March 7, 2024*

19.     On March 7, 2024, during an earnings call, Koenig was asked about expectations for the preliminary TAMARACK data coming up at ASCO. He responded "[g]iven the dosing right now of 2.7 mg/kg Q4 and 2 mg/kg Q4 and with expectations if the safety is improved as we

expect we should be actually delivering as much or more of the 2.7 mg/kg Q4 as compared to historical treatment with the 3 mg/kg Q3." The relevant portion of the call is below:

> Wei Ji Chang Leerink Partners LLC, Research Division – Senior MD of Emerging Oncology & Senior Research Analyst
>
> First question, can you help set expectations for the preliminary TAMARACK data coming up at ASCO? And then second question, can you discuss the rationale behind expanding the TAMARACK study to include patients with non-small cell lung cancer, small cell melanoma, head and neck and anal cancer. What is informing this decision?
>
> Scott Koenig MacroGenics, Inc. – President, CEO & Director
>
> Thank you so much, Jonathan. As you've heard me previously, we had taken an evaluation of our own data that published recently by Daiichi on the 7,300 molecule at ESMO this past fall, and other data that was out there with regard to activity against the prostate cancer. And with that, as I have noted, and which we have not changed the ranges that we were seeing. Just to recall, we saw about half the patients in our 3 mg/kg of Q3 weekly dosing of vobra duo in our expanded approximately 40-patient cohort of about half those patients reducing PSA50 from baseline.
>
> Given the dosing right now of 2.7 mg/kg Q4 and 2 mg/kg Q4 and with expectations if the safety is improved as we expect we should be actually delivering as much or more of the 2.7 mg/kg Q4 as compared to historical treatment with the 3 mg/kg Q3. As a result, we expect the PSA50 to be in a similar range, somewhere between 40% and 60% PSA50 reduction.
>
> With regard to overall response rate, again, as we had previously presented, approximately 1/4 of patients achieved both confirmed and unconfirmed responses, and this is similar to that which was reported by Daiichi of 25%. So our expectation is we should be 25% or greater.
>
> With regard to rPFS, which is the primary endpoint of this study and a very important one in terms of obviously prolonging both the life and the quality of life of these patients. Daiichi reported 5.3 months of rPFS. And what we have said is that we expect to have at least 6 or greater in terms of rPFS going forward.
>
> Now with regard to the specific tumor types, we have selected for study in these expansions, again, taking advantage of our own experiences of treatment of patients with a subset of these tumors as well as the histology and expression of B7-H3 on these tumor types. We think these are very promising tumors to pursue. I should also point out, while we are expanding into 5 different tumors now, we are also considering additional tumors in the future to conduct studies.

*April 3, 2024*

20.     On April 3, 2024, Defendants issued a press release providing an update on the Phase 2 TAMARACK study of vobra duo. The announcement summarized a research abstract's findings as to vobra duo's safety profile, in which grade 3 events were under 32% for both doses and no deaths were reported. The press release also included a table containing the safety results, as follows:

|  | Vobra duo 2.0 mg/kg (n=91) | Vobra duo 2.7 mg/kg (n=86) |
|---|---|---|
| Any TEAE | 85 (93.4%) | 82 (95.3%) |
| TEAE Grade ≥ 3 | 23 (25.3%) | 27 (31.4%) |
| Serious AE | 11 (12.1%) | 17 (19.8%) |
| Drug Interruption due to AE | 10 (11.0%) | 16 (18.6%) |
| Drug Discontinuation due to AE | 4 (4.4%) | 2 (2.3%) |
| Fatal AE | 0 | 0 |

21.     On the same day, Koenig stated "[w]hile the TAMARACK data will not be presented at the ASCO Annual Meeting, we intend to maintain our previously disclosed plan to share further TAMARACK interim data, including updated safety and preliminary efficacy, by the end of May…This updated information will be based upon a future data cut-off. In addition, we still anticipate presenting updated clinical data – including radiographic progression-free survival, or rPFS, the study's primary endpoint – in the Fall of 2024."

22.     The above statements in Paragraphs 19 to 21 were false and/or materially misleading. Defendants provided investors with material information concerning MGNX's early

interim safety data from the MGNX's ongoing TAMARACK Phase 2 study that materially mislead and/or failed to disclose information pertinent to investors. In pertinent part, Defendants' statements created a materially misleading impression concerning the safety profile of vobra duo and the totality of the Phase 2 TAMARACK study data.

*The Truth Emerges*

*May 9, 2024*

23.     On May 9, 2024, MGNX presented interim updated safety and efficacy data for its cancer treatment study TAMARACK., all based on a data cut-off date of April 12, 2024:

| Safety Summary: | | |
|---|---|---|
| Safety Population | n=90 | n=86 |
| Treatment-Emergent Adverse Events All Grade | 89 (98.9%) | 86 (100.0%) |
| Treatment- Emergent Adverse Events Grade ≥3 | 49 (54.4%) | 44 (51.2%) |
| TEAE Leading to Study Drug Discontinuation | 10 (11.1%) | 13 (15.1%) |
| TEAE Leading to Study Drug Dose Reduction | 39 (43.3%) | 44 (51.2%) |
| TEAE Leading to Study Drug Dose Interruption | 38 (42.2%) | 48 (55.8%) |

24.     The updated data indicated that vobra duo's adverse event rate was over 98.9% and 100% for both the 2.0 mg/kg and 2.7 mg/kg dosages, respectively, and that adverse events grade 3 or greater were over 50% for both dosages. There were five fatalities, three of which are being investigated for possible links to the study.

25.     Despite the disappointing data, Koenig stated "[w]e are very encouraged by the interim updated safety and preliminary efficacy data from the TAMARACK study of vobra duo in metastatic castration-resistant prostate cancer…[w]e believe this interim data set helps validate our previously stated hypothesis that improved tolerability coupled with compelling biological activity could be achieved through dose reductions and a longer dosing interval. We believe vobra duo's biological activity shown to date aligns well with the parameters we outlined at the outset of the study."

26.     Analysts rejected Koenig's spin on the data results. In pertinent part, Guggenheim analysts reported on May 10, 2024, that, while patient deaths are not uncommon in late-stage oncology trials, "the increase from 0 fatal AEs noted as of the time of the abstract data cut, . . . taken in context of the broader safety update, raised investor suspicion around the overall safety profile of vobra duo."

27.     Investors and analysts reacted immediately to MGNX's revelation. The price of MGNX's common stock declined dramatically. The stock price dropped from $14.67 to $3.31 on May 10, 2024, 2024, MGNX's share fell to 77.4%and there was a stock drop of $11.36/ share. The fact that these analysts, and others, discussed MGNX's shortfall and below-expectation projections suggests the public placed significant weight on MGNX's statements of prior confidence in their new strategy. The frequent, in-depth discussion of MGNX's guidance confirms that Defendants' statements during the Class Period were material.

### Loss Causation and Economic Loss

28.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MGNX's common stock and operated as a fraud or deceit on Class Period purchasers of MGNX's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of MGNX's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of MGNX's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

29.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning related to MGNX's clinical trial data. When the truth was revealed concerning the data and, in particular, the safety of vobra duo, the artificial inflation in MGNX's stock price created by Defendants' false statements then dissipated. The price of MGNX's common stock declined dramatically. The stock price dropped from $14.67 to $3.31 on May 10, 2024, 2024, MGNX's share fell to 77.4% and there was a stock drop of $11.36/ share.

***Presumption of Reliance; Fraud-on-the-Market***

30.     At all relevant times, the market for MGNX's securities was an efficient market for the following reasons, among others:

    (a)     MGNX's common stock met the requirements for listing and was
            listed and actively traded on the NASDAQ during the Class Period,
            a highly efficient and automated market;

    (b)     MGNX communicated with public investors via established market
            communication mechanisms, including disseminations of press
            releases on the national circuits of major newswire services and
            other wide-ranging public disclosures, such as communications with
            the financial press and other similar reporting services;

    (c)     MGNX was followed by several securities analysts employed by
            major brokerage firms who wrote reports that were distributed to the
            sales force and certain customers of their respective brokerage firms
            during the Class Period. Each of these reports was publicly available
            and entered the public marketplace; and

(d)     Unexpected material news about MGNX was reflected in and incorporated into the Company's stock price during the Class Period.

31.     As a result of the foregoing, the market for MGNX's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in MGNX's stock price. Under these circumstances, all purchasers of MGNX's common stock during the Class Period suffered similar injury through their purchase of MGNX's securities at artificially inflated prices, and a presumption of reliance applies.

32.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

33.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

34.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements"

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

35.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of MGNX who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased MGNX's stock or sold MGNX puts during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

37.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MGNX's securities were actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MGNX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of March 1, 2024, there were approximately 62,432,013 shares outstanding. Upon information and belief, these shares are held by thousands of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

38.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MGNX;

(c)    whether the Individual Defendants caused MGNX to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of MGNX's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*
### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

42.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

44.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other

members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MGNX common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire MGNX's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

45.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MGNX's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

46.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

47.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of MGNX's internal affairs.

48.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to MGNX's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of MGNX's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired MGNX's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

49.     During the Class Period, MGNX's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of MGNX's common stock at prices artificially inflated by defendants' wrongful conduct. Had

Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of MGNX's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of MGNX's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

50.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

51.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against the Individual Defendants
### for Violations of Section 20(a) of the Exchange Act

52.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

53.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about MGNX's misstatements.

54.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by MGNX which had become materially false or misleading.

55.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which MGNX disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MGNX to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MGNX's common stock.

56.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause MGNX to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

57.     By reason of the above conduct, the Individual Defendants and/or MGNX are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

[Signature block on following page]

Dated: July 26, 2024                    Respectfully submitted,


**LEVI & KORSINSKY, LLP**


 *s/ Jordan A. Cafritz*
Jordan A. Cafritz (#20908)
1101 Vermont Ave. NW, Suite 700
Washington, D.C. 20005
Tel: (202) 524-4290
jcafritz@zlk.com

Adam M. Apton (pro hac vice forthcoming)
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*